**MIRACLE BLADE, LLC, Plaintiff,**

v.

**EBRANDS COMMERCE GROUP, LLC, et al, Defendants.**

**No. CV–N–02–0226–DWH, CV–N–02–0226–VPC.**

United States District Court, D. Nevada.

June 4, 2002.

Leslie Bryan Hart, Reno, NV, Carolyn Pitts-Jones, Atlanta, GA, Jennifer B. Moore, Atlanta, GA, Patrick J. Flinn, Atlanta, GA, Robert L. Lee, Atlanta, GA, for Miracle Blade, LLC.

Michael Rounds, Reno, NV, Daniel M. Cislo, Santa Monica, CA, Donald M. Cislo, Santa Monica, CA, Robert J. Lauson, Cislo & Thomas LLP, Santa Monica, CA, for Ebrands Commerce Group, LLC, CME-DIA, LLC, John W. Kirby, Jack Kirby, George Sylva, Brad Galinson.

## ORDER

HAGAN, District Judge.

Before the court is plaintiff's Motion for Preliminary Injunction (# 's 13/14) and defendants' Motion to Transfer (# 36). Both parties have filed objections to each other's evidence. (# 's 37, 45/46).

### I. *Factual Background*

Plaintiff and defendants, Katsu and Ebrands, both sell kitchen knives through direct marketing techniques, i.e. "Infomercials." Plaintiff filed its lawsuit on April 23, 2002 alleging copyright infringement, trade dress infringement and Nevada and California state common law claims.

Plaintiff Miracle Blade is an LLC organized in Delaware with its principal place of business in Los Angeles, California. Plaintiff acquired the rights to develop and

market the "Miracle Blade III Knives" from its parent, Sylmark. (Compl.(# 2) ¶¶ 12.)

Plaintiff alleges that it spent over a million dollars and substantial amounts of time in developing its product and techniques to market it.[1] During this process, plaintiff claims it developed many unique demonstrations for the infomercial, designed unique features for the knives, and organized the knives into an arbitrary set for sale. Plaintiff's infomercial advertising its knives has been airing since October 27, 2001 on television stations across the country. (Compl.(# 2) ¶¶ 13–22.) The Miracle Blade infomercial takes place at a cooking school in France with the host, Chef Tony, demonstrating the knives before a class of students. The demonstrations involve fruits, vegetables, bread, a pork chop, flowers and abuse to the knives. (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Ex. A1 (Miracle Blade Infomercial).) The Miracle Blade knives have black curved handles, with the Miracle Blade label prominently displayed on the blade, and are offered for $39.95 in a multi-piece set comprised of "two large slicing knives, one cleaver, one combination chopper-spatula, one paring knife, one set of kitchen shears, and four steak knives." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), at 3.). Throughout the infomercials, viewers are offered various promotional items such as steak knives, and are encouraged to call the toll-free number on the screen to place their order.

Defendant Katsu is a California LLC with its principal place of business in Los Angeles. Until April 5, 2002, Katsu was registered as a Nevada LLC. (Pl.'s Opp'n (# 53), Ex. 6.) Defendant Ebrands is a Nevada LLC with its principal place of business also in Los Angeles. Defendants are both responsible for the production and marketing of their knives, "Katsu Contour Pro."[2]

Katsu and Ebrands began to air their infomercial advertising the "Katsu Contour Pro" knives around April of 2002. It appears that defendants were only test marketing their infomercial on a few television stations and have not begun a wide distribution of it. Defendants also offer their knives on their website, *www.contour-pro.com.* Defendants also maintain that they have spent large amounts of money in the development of these knives and marketing tools.

Defendants' knives are similar to plaintiff's in that they have black curved handles and are offered in a similar set. However, the blades of defendants' knives are labeled differently and the edges of their knives are smooth.

In defendants' infomercial, "Mick," an Englishman, and his female co-host present the knives in a kitchen-setting to a group of potential consumers. Like plaintiff, defendants' infomercial uses fruit, bread, vegetables, frozen objects, a pork chop, flowers and abuse demonstrations. They also stress the knives' Japanese origin by using a scene with an actor dressed as a samurai wielding the knives to transition between demonstrations in the infomercial. They also offer their knives in a similar set but with different promotional

---

**1.** Plaintiff has copyrighted the infomercial and the telemarketing script. (*See* Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Exs. E & H (copyright registrations for the infomercial and script).)

**2.** The following individuals have also been named as defendants: (1) John Kirby, a resident of California and the CEO of Ebrands; (2) George Sylva, a resident of California and producer of the defendants' infomercial; (3) Brad Galinson, a resident of California and principal and member of Ebrands and Katsu; and (4) Cmedia, an Oregon LLC with its principal place of business in Los Angeles, that purchased air time on behalf of defendants for their infomercial. (*See* Compl. (# 2); Answer (# 49).)

items for $39.95, and encourage viewers to call their toll-free number to order a set. (Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), Ex. A2 (Katsu Contour Pro Infomercial).)

As noted above, plaintiff filed its lawsuit on April 23, 2002 and requested a temporary restraining order. Plaintiff's request was denied on April 29, 2002 and oral argument for the preliminary injunction was set for May 29, 2002 at 1:30 p.m. (Order (# 17).) On May 9, 2002, defendants filed a similar action against plaintiff, its officers and others in the Central District of California. (See Answer (# 49), Ex. 1.)

In addition, over the course of the intervening weeks, the parties have papered each other with lengthy motions and briefings. Before the court today, in addition to the request for preliminary injunction, are the defendants' motion to transfer the action to the Central District of California and the parties' objections to each other's evidence.

In sum, plaintiff contends that defendants have copied its infomercial, its script for telephone operators and the features of its knives. Defendants counter that the knives are not similar and that the common elements of the parties' infomercials are actually demonstrations both parties have recycled from prior infomercials.

## II. *Analysis*

### A. Parties' Objections to the Evidence Submitted

#### 1. Plaintiff's Objections (#'s 45/46)

Plaintiff has presented the following several objections to defendants' declarations:

#### a. Declaration of Michael Hastie

■ Plaintiff objects to the following statement of Michael Hastie ("Mick") regarding his opinion of the sources of Katsu's demonstrations as an improper lay opinion and as irrelevant:

- Katsu's infomercial is "really not much more than an accumulation of speeches, demonstrations and activities that have been used by me and others in the United Kingdom, as well as in the United States, prior to the airing of the Miracle Blade Infomercial." (See Defs.' Opp'n (# 38), Hastie Decl. ¶ 8.)

Since Hastie identifies the first hand knowledge on which he bases his opinion, he is entitled to give this opinion about the Katsu knives. Fed.R.Evid. 701. Plaintiff's argument that Hastie shouldn't be able to make this opinion without consulting plaintiff's infomercial is incorrect because Hastie a opinion doesn't address plaintiff's infomercial. Finally, since this case requires identifying the protected original elements of Miracle Blade's infomercial and determining whether defendants copied from plaintiff, these statements are relevant. Fed.R.Evid. 401.

#### b. Declaration of Jack Kirby

■ First, plaintiff objects that Kirby's declaration contains the following inadmissible opinions offered by a lay witness:

"I find that Miracle Blade is unfairly competing with my company..." [The last half of the statement states that Miracle Blade is competing unfairly because of its inaccurate portrayal of the knives as made of German steel, of Chef Tony as a Chef, of the infomercial being shot in France.] (See Defs.' Opp'n (# 38), Kirby Decl. ¶ 9.)

- "The very filing of the instant litigation, in my view, is nothing more than an attempt by Miracle Blade to stifle competition from a competitive product..." [The statement concludes with "such as the KATSU CONTOUR PRO."] (Id.)

Both of these statements by Kirby are improper lay opinions since Kirby hasn't demonstrated what personal knowledge he has to support these opinions about plain-

tiff's products or motives. Fed.R.Evid. 701.

Next, plaintiff argues that the following statements by Kirby should not be considered because they are improper lay opinions and violate the best evidence rule:

• Kirby's statements that he compared the parties' infomercials and "the knife infomercial that [he] was intimately involved with in 1990," and concludes "all of the knife infomercials mimic each other." (*See* Defs.' Opp'n (#38), Kirby Decl. ¶ 5.)

• Kirby's statements that the 191 elements plaintiff alleges that defendants copied from their infomercial are recycled from prior infomercials. (*Id.* ¶ 10.)

■ The first set of statements are permissible opinions by a lay witness since Kirby has sufficiently identified the source of his opinions. Fed.R.Evid. 701. His opinion merely states that in his experience, these similar demonstrations have cropped up in a variety of displays of kitchen knives. Since he is not trying to offer the content of other infomercials into evidence, there is no best evidence problem.

■ The second set of statements renders a more specific opinion as to the creativeness of the elements of Miracle Blade's infomercial, and is not admissible since Kirby has not established first hand knowledge as to each element alleged as copied. Fed.R.Evid. 701.

■ Plaintiff next levels the following hearsay objection against the following statements of Kirby:

• "It has come to my attention that Miracle Blade, LLC and principals ... have contacted several entities with whom we are doing business, or wish to do business with, and have threatened them or in some manner persuaded them not to business with my company, all to the detriment of the business of my compa-

ny." (*See* Defs.' Opp'n (#38), Kirby Decl. ¶ 8.)

Since the court agrees with plaintiff and finds the relevance of this statement to these proceedings is minimal at best, it will not be considered. *See* Fed.R.Evid. 401, 802.

■ Finally, plaintiff contends that Kirby's statement that he has viewed the prior Miracle Blade infomercials and he doesn't "see how [Miracle Blade III] differs very much from the MIRACLE BLADE II and MIRACLE BLADE I infomercials." (*See* Defs.' Opp'n (#38), Kirby Decl. ¶ 8.) Again the court will not consider this because it is not relevant. Fed.R.Evid. 401.

### c. Declaration of Michelle Cardinal

■ Plaintiff objects to the following paragraph in Cardinal's declaration as irrelevant: "I got the inference that Peter Spiegel, Mark Bess, and Miracle Blade, LLC seek to intimidate disinterested third persons, like myself who merely purchase media time, from doing any business with the accused defendants." (*See* Defs.' Opp'n (#38), Cardinal Decl. ¶ 5.) The court will not consider this paragraph because it is irrelevant to the current proceedings. Fed.R.Evid. 401, 402.

### d. Declaration of Anthony Hoffman

■ Plaintiff requests that Hoffman's declaration not be considered because he is not qualified to give expert testimony on these issues. Particularly, the plaintiff takes aim at defendants' use of Hoffman to give opinions on (1) the infomercial industry generally; (2) comparisons of the elements of the Miracle Blade and Katsu infomercials; and (3) the cost of creating the Miracle Blade infomercial. Plaintiff contends he is not qualified as an expert to render any of these opinions.

First, Hoffman qualifies as an expert under Fed.R.Evid. 702 because (1) this dispute involves issues that are "scientific, technical, or specialized in nature;" and (2) Hoffman has the requisite "knowledge, skill, experience, training or education" based upon his over ten years experience in the industry, his employment as a lecturer on infomercials and direct marketing at UCLA and USC Law School and at various marketing association meetings, and his prior experience as an expert witness in cases involving infomercials. (*See* Defs.' Opp'n (# 38), Hoffman Decl. ¶ 1, Ex. 1 (resume).)

The testimony offered by Hoffman is within his area of expertise. His declaration shows that he has been involved in over 200 prior infomercial projects in a variety of roles, and personally produced two infomercials on knives in the early 1990's. Accordingly, he has the requisite experience to allow him to render opinions on the infomercial industry, and the comparisons of the two infomercials.

██ Additionally, the plaintiff raises some relevance objections to Hoffman's declaration. Specifically, plaintiff argues that Hoffman's estimations of the actual costs of producing an infomercial in paragraph seven are irrelevant. The court agrees and will not consider this paragraph. Fed.R.Evid. 401–402.

#### e. Declaration of Brad Galinson

██ Plaintiff objects to the following statements of Galinson as improper opinion testimony:

- Neither he nor Ebrands or Katsu have "encroached or infringed upon any proprietary rights..." (*Id.* ¶ 3.)
- the instant litigation is "without foundation" and "baseless." (*Id.* ¶ 5.)

The court agrees. The first statement will also be disregarded as an improper opinion because it arrives at a legal conclusion. Fed.R.Evid. 701 & 704. The last

statement is similar to Kirby's statements discussed above, and will not be considered because it is an improper lay opinion. Like Kirby, Galinson has not demonstrated what personal knowledge he has to support these opinions about plaintiff's products or motives. Fed.R.Evid. 701.

Plaintiff also objects to statements in paragraphs two and four of Galinson's declaration as hearsay. Because parts of these paragraphs are hearsay and neither are relevant to the current proceedings, the court will not consider either of these paragraphs. Fed.R.Evid. 401–402, 802.

██ Finally, plaintiff contends that Galinson's statements in paragraph seven regarding the harm the injunction will cause defendants are irrelevant. Since the relative hardships of the parties is a factor for the court to consider, and Galinson has demonstrated his personal knowledge to make this assessment, the court will consider this paragraph. Fed.R.Evid. 401, 602.

#### f. Declaration of George Sylva

First, plaintiff objects to the following statement in Sylva's declaration as an improper legal conclusion:

"clearly shows that there is no copyright infringement," [Following Sylva's statement that he prepared a side-by-side comparison of the parties' infomercials.] (*See* Defs.' Opp'n (# 38), Sylva Decl. ¶ 9.)

Since this statement informs the trier of fact of what legal conclusion to reach, this statement is an improper opinion and will not be considered. Fed.R.Evid. 701 & 704.

Next, plaintiff objects to several statements in Sylva's declaration. (*See* Defs.' Opp'n (# 38), Sylva Decl. ¶¶ 3, 5, 6, 8.) Plaintiff contends all these statements violate the best evidence rule, and are impermissible summary evidence. Additionally, plaintiff states that Sylva's statements in ¶ 3 are inadmissible opinions by a lay wit-

ness. Finally, plaintiff objects to the video of comparisons that Sylva created as improper summary evidence. Fed.R.Evid. 1006.

■ As to the summary video (defendants' exhibit seven), the court finds that, although defendants did not comply with Fed.R.Evid. 1006 to the letter, the video is admissible given the unique exigencies present in a preliminary injunction and in this case in particular. First, the presentation as a summary was appropriate under Rule 1006 because presenting each comparison infomercial in its entirety would have been an inconvenience for the court to examine. Additionally, the court finds that defendants sufficiently identified, in both their video and Sylva's declaration, the source of these excerpts; that plaintiff had possession of these materials at least 10 days prior to the hearing; and that it does not appear from the record that plaintiff made any motion to compel production of the entire infomercials. Accordingly, the court finds that plaintiff had sufficient opportunity and notice to attempt to retrieve these materials. In situations such as these, the court, in its discretion, may consider inadmissible evidence. *See Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984).

■ The court similarly finds no problems with the challenged statements of Sylva. First, with regard to Sylva's claims of personal experience in producing similar shows in paragraph three, Sylva identified the show he produced, and gave an opinion based upon his personal knowledge and experiences. He is not trying to offer the prior show into evidence. Accordingly, these statements are appropriate. Fed. R.Evid. 701. Next, plaintiff objects to Sylva's statement in paragraph five that Miracle Blade's format and script "follows the same format and script that have been

used for years in the infomercial business." Given Sylva's experience in the direct marketing industry, and in particular his experience producing a knife infomercial, Sylva has sufficient personal knowledge to form these opinions. *Id.* Finally, Sylva's statements in paragraphs six and eight are admissible for similar reasons outlined above.

### 2. Defendants' Objections (# 37)

Defendants present the following objections to portions of the declarations submitted by Ari Wasserman, Harold R. Schneider, Peter Spiegel, and Steven L. Ober. Plaintiff has responded.

### a. Declaration of Ari Wasserman

■ Defendants contend that the following statements should be excluded under Fed.R.Evid. 901(a):

- "The name and mark 'Miracle Blade' has been synonymous for years with a multi-piece set of quality kitchen knives offered at an affordable price. Several generations of a multi-piece set of knives were offered from 1990 through 1998 under the name and mark 'Miracle Blade' and sold over 2.5 million units." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Wasserman Decl. ¶ 2.)

Defendants maintain that Wasserman has not provided sufficient foundation to demonstrate that he has held a position with Miracle Blade since 1990. However, Wasserman is the Vice President of Business Development and in that role is responsible for developing and maintaining relationships between Sylmark, its affiliates, and its partners as well as coordinating Miracle Blade's business efforts. Through this position, it seems he would have acquired sufficient knowledge to lay a foundation for this evidence.[3] Accordingly, these statements will be considered.

---

**3.** On a separate note, this seems an improper ground for objection because 901(a) pertains

■ Defendants next object to the following statements by Wasserman on the basis of lack of personal knowledge or experience:

• "Miracle Blade believes that Defendants' unlawful conduct is purposefully designed to flood the market with knock-off products utilizing knock-off advertising to satisfy the pent up demand for Miracle Blade's products that Miracle Blade created as a result of the test marketing of its Miracle Blade infomercial and to divert future sales of products rightly belonging to Miracle Blade. Miracle Blade also believes that Defendants' infomercial is scheduled to air on multiple occasions in the coming weeks, thereby causing Miracle Blade even greater harm." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Wasserman Decl. ¶ 5.)

Again, given Wasserman's position with plaintiff, he seems capable of forming these opinions, and these opinions meet the requirements of Fed.R.Evid. 701.

### b. Declaration of Harold R. Schneider

■ Defendants argue that Schneider provided an insufficient authentication of the copy of plaintiff's script attached as Exhibit F. It appears sufficient authentication has been provided since plaintiff submitted a declaration of Robert L. Lee, counsel for Miracle Blade, who states that he attached Exhibit F to plaintiff's motion, and that Schneider provided the script attached as Exhibit F to him through electronic or overnight mail. Accordingly, plaintiff has sufficiently authenticated Exhibit F. Fed.R.Evid. 901. (Supplemental App. of Exs. (# 48), Ex. E ¶ 9 (Lee Decl.).)

to non-testimonial evidence and a declaration seems to be more testimonial. Defendant

### c. Declaration of Peter Spiegel

Defendants object to the following statements by Peter Spiegel on the ground of lack of personal knowledge:

• "In this instance, Miracle Blade has devoted substantial time, over the course of years, and money to design and develop the Miracle Blade III knives and refine the knife blades. Miracle Blade has further committed financial resources in excess of $1.6 million to design, develop, air, and test market its Miracle Blade III infomercial to determine whether the Miracle Blade III Knives are even a viable consumer product. Miracle Blade took the substantial risk that the Miracle Blade III Knives may not be successful, and now that its risk may apparently pay off, Defendants threaten to destroy all that Miracle Blade has worked for." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Spiegel Decl. ¶ 7.)

As with Wasserman, Spiegel's position with plaintiff provided him with sufficient personal knowledge to lay a foundation for these statements. Spiegel also provided sufficient information in his declaration to demonstrate his personal knowledge.

■ Defendants also object to this statement offered by Spiegel:

• "Miracle Blade believes that Katsu is a shell corporation with[out] (sic) any assets, Ebrands is a partnership with all substantial assets passing through to the shareholders, and it is my personal experience that the individual defendants Kirby, Sylva, and Galinson will have plenty of time to find ways to make themselves judgement proof." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), Spiegel Decl. ¶ 12.)

should have argued lack of personal knowledge.

Defendants make the same objection as above. This evidence will not be considered because Spiegel has not demonstrated what personal knowledge he has to support these opinions about defendants. Fed.R.Evid. 701.

#### d. Declaration of Steven L. Ober

Defendants contend that Ober has not sufficiently authenticated the transcribed scripts from the infomercials attached as Exhibits C and D. As with the objection listed under Harold Schneider, plaintiff has sufficiently authenticated these scripts. Fed.R.Evid. 901. (Supplemental App. of Exs. (# 48), Ex. E ¶ 9 (Lee Decl.).)

Defendants also object that Ober has not authenticated the screen print comparisons attached as exhibits A.4 and B. They state he has not demonstrated he has personal knowledge that they are what they appear to be or who prepared them. Defendants are correct. Ober does not provide that information in his declaration. However, in light of the exigencies present in this case, the court will consider this exhibit. *Flynt Distrib. Co.*, 734 F.2d at 1394.

### B. Plaintiff's Motion for Preliminary Injunction

#### 1. Ninth Circuit Preliminary Injunction Standard

A preliminary injunction is "an extraordinary remedy, which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) (quoting *Frank's GMC Truck Center, Inc. v. G.M.C.*, 847 F.2d 100, 102 (3d Cir.1988)). This remedy should only be granted where the merits of the case clearly favor one party over the other. *See Remlinger v. Nevada*, 896 F.Supp. 1012, 1015 (D.Nev.1995). As the *Remlinger* court explained.

"The cases best suited to preliminary relief are those in which the important facts are undisputed, and the parties simply disagree about what the legal consequences are of those facts. The court in such a case can take the undisputed facts, apply the law to them, and fairly easily decide which party is likely to prevail."
*Id.*

A party seeking a preliminary injunction must fulfill one of two standards, described in the Ninth Circuit as "traditional" and "alternative." *See Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987). Under the traditional standard, a court may issue preliminary relief if it finds that (1) the moving party will probably prevail on the merits; (2) the moving party will suffer irreparable injury if the relief is denied; (3) the balance of the hardships favor the moving party; and (4) the public interest favors granting relief. *Id.*

Under the alternative standard, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury; or (2) that serious questions exist and the balance of hardships tips sharply in its favor. *See id.* This latter formulation represents two points on the sliding scale in which the required degree of irreparable harn increases as the probability of success decreases. *See Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985). Under either test, a plaintiff must demonstrate the existence of a significant threat of irreparable injury. *Id.*

#### 2. Evaluation of Plaintiff's Copyright Infringement Claims (Counts I & II)

To state a claim for copyright infringement, plaintiff must demonstrate:

(1) ownership of a valid copyright; and (2) infringement of that copyright by invasion of one of the exclusive ownership rights.[4] *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1397–1398 (9th Cir.1997). Plaintiff here contends it holds valid copyrights to the Miracle Blade infomercial and the telephone script, and that defendants copied both. (Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), at 15–16.)

### a. Ownership

▉▉▉ First, plaintiff has provided copies of the registration certificates for both the infomercial and the script to demonstrate ownership. (*See id.*, Exs. E (infomercial copyright) & H (script copyright).) Ownership is established since registration of a work constitutes prima facie evidence of ownership and defendants do not dispute plaintiff's claims of ownership in their opposition. *See* 17 U.S.C. § 410(c). Defendants do, however, dispute the scope of plaintiff's copyrights and plaintiff's contentions that defendants infringed its copyrights.

### b. Evidence of Copying

▉▉▉ In addition to ownership, plaintiff must demonstrate that defendants infringed its copyright. Since evidence at actual copying by another is rare, "[c]opying can be shown by circumstantial evidence of access to the copyrighted work, and substantial similarity between the copyrighted work and the infringer's work." *Johnson Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1176 (9th Cir.1989).

### i. Access to the Infringed Work

▉▉▉ Proof of access only requires demonstrating "the defendant had an opportunity to view or to copy plaintiff's work." *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977). *See also Three Boys Music Corp. v. Bolton*, 212 F.3d 477 (9th Cir.2000). The Miracle Blade infomercial was first aired on October 27, 2001, and has been aired on over 500 television channels across the country since. (Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), Schneider Decl. ¶¶ 2–3.) Plaintiff also alleges that copies of infomercials are available through infomercial tracking services following the initial airing. (Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), at 17.) Similarly, it appears that defendants could access plaintiff's script by simply calling plaintiff's toll-free telephone number displayed on their infomercial. Defendants do not dispute these contentions. In considering plaintiff's assertions, it appears that defendants had access to plaintiff's infomercial and the script.

### ii. Substantial Similarity

▉▉▉ To determine whether two works are substantially similar, the court must undergo the following procedure: (1) determine through analytic dissection the scope of the copyright; (2) determine whether the works are extrinsically similar; and (3) determine whether the works are intrinsically similar. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir.1994).

As an initial matter, the scope of the copyright must be determined because "only those elements of a work that are protectable and used without the author's permission can be compared when it comes to the ultimate question of illicit copying." *Id.* In determining the scope, the plaintiff

---

**4.** Those exclusive rights are: (1) to reproduce the copyrighted work; (2) to prepare derivative works based on the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public; (4) to perform the work publicly; and (5) to display the copyrighted work publicly. 17 U.S.C. § 106.

must first identify the elements alleged to be similar and present in both works. Next, the court, through analytic dissection and expert testimony if needed, must determine if any of these elements alleged by plaintiff are protected under copyright. In doing so, the court must consider the applicable doctrines that narrow the scope of copyright protections, such as merger, *scenes a faire* and originality. Finally, the court must identify the scope of plaintiff's copyright, i.e. whether it is entitled to thin or broad protections. If it is the former, then infringement is only established by demonstrating almost verbatim reproduction or very close paraphrasing. *Id.* at 1443–1445.

### (a) Evaluation of the Infomercials

First, plaintiff alleges defendants copied the following elements from its infomercial: plaintiff's fruit, vegetable, filet and abuse demonstrations and plaintiff's choice of words, such as "still $39.95" and references to using the shears "in the garden." Plaintiff also alleges that defendants copied the sequence, dialogue, theme and pace of its demonstrations. (Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), at 20.) Defendants counter that the demonstrations are not original to plaintiff and, in the alternative, are unprotected as *scenes a faire*, and that the works are not substantially similar even when considered as a compilation copyright.

 In determining whether the identified elements are protected, the court must consider all the applicable rules that limit copyright protections. First, it is plain that only expression of an idea, and not ideas or facts, are protected by copyright law. *See* 17 U.S.C. § 102(b). A related concept is merger, i.e. when the expression and idea coincide. In such a case, expression will only be protected against verbatim copying. Another important doctrine is *scenes a faire*, which pertains to expressions that are, at the least,

standard treatment of a particular idea. *Apple Computer, Inc.*, 35 F.3d at 1443–1445. As the Central District of California recently explained,

> In the genre of television commercials for direct telephone/mail sales, scenes a faire include "references to more expensive competing products, shots of print advertisements of such products, free offers of complementary goods, close ups of the offered item in use, and close ups of 'undesirable' competing goods during similar use."

*Smart Inventions, Inc. v. Allied Communications Corp.*, 94 F.Supp.2d 1060, 1067 (C.D.Cal.2000) (quoting *American Direct Marketing, Inc. v. Azad Int'l, Inc.*, 783 F.Supp. 84, 95 (E.D.N.Y.1992)). Finally, the doctrine of originality specifies that copyright protection is only afforded to those elements of a work that are original to the author, and that protection may only be afforded to the original arrangement and selection of those borrowed elements. *Apple Computer, Inc.*, 35 F.3d at 1445.

 In applying these tenets to the parties' infomercials here, it appears that the elements demonstrations identified by plaintiff as copied are not original to plaintiff. As defendants have demonstrated, plaintiff borrowed these elements from prior infomercials. To illustrate, defendants demonstrated that plaintiff borrowed several demonstrations, including the tomato filet, frozen food, abuse, and bread demonstrations from prior infomercials. (*See* Defs.' Opp'n (#38), at 7–9, Ex. 7 (compilation of prior infomercials for kitchen knives using similar demonstrations and dialogue).) Moreover, to the extent plaintiff complains of defendants making similar bonus offers to customers, those are *scenes a faire*. *Smart Inventions, Inc.*, 94 F.Supp.2d at 1067. Plaintiff's allegations that defendants copied plaintiff's price should also not be considered since price is

a non-copyrightable fact. Accordingly, these elements should not be considered in evaluating whether defendants copied plaintiff's infomercial.

■ Plaintiff further alleges that defendants copied plaintiff's sequence of events, the dialogue and pace, and as a result have utilized the total look and feel of plaintiff's infomercial. In performing the extrinsic test on a dramatic work, such as an infomercial, the court must objectively evaluate whether the alleged infringer copied such things as "the theme, plot, dialogue, mood, pace, setting, characters and sequence of event." *Id.* at 1065.

In comparing the two infomercials, it cannot be said that defendants copied these elements from plaintiff. Chiefly, there are significant differences in the settings, the moods, the plots and the dialogue between the hosts. For instance, in the first part of plaintiff's infomercial, the host Chef Tony, dressed in chef garb, demonstrates his product to students at a cooking school in France. Defendants' host Mick, an Englishman, and his female co-host, Su, present to an audience of consumers in a kitchen-type setting. Plaintiff's program emphasizes the German background of the knives. Defendants promote its knives as "blades" that are of Japanese origin, and use an actor dressed as a samurai wielding a knife to transition to a new scene. (*Compare* Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), Exs. A1–A (the parties' infomercials).)

■ Furthermore, a comparison of the two infomercials demonstrates they are not similar intrinsically. The intrinsic test is a subjective one that evaluates, from the standpoint of an ordinary consumer, whether there is substantial similarity in the "total concept and feel of the works."

*Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir.1988). In viewing these works, an ordinary consumer would not find that defendants have taken protected expression from plaintiff. For the reasons discussed above and others, the total look of the infomercials is different.[5]

### (b) Evaluation of the Scripts

■ Plaintiff also alleges defendants copied its telemarketing script verbatim. (Mot. for T.R.O. & Prelim, Inj. (#'s 13/14), at 6, 20–21, Ex. G.) Defendants contend they did not copy plaintiff's script, and moreover, plaintiff's script is not protected. (*See* Defs.' Opp'n (# 38), at 23 & Kirby Decl. ¶ 11.)

Several principles demonstrate that plaintiff's script is not protected. First, 17 U.S.C. § 102(b) specifies that procedures, processes, and methods of operations are not protected under copyright law. The practice of telemarketers offering additional discounts and extra items to entice consumers to purchase more seems like a method of operation, procedure or process. In addition, when evaluating the elements of the script as identified by plaintiff as copied, it is clear that they are not prosected. First, plaintiff complains that defendants' operators offer similar prices for their knife sets and similar bonus offers. Such offers are *scenes a faire*, and the prices are facts, and plaintiff cannot claim copyright protections in either. Finally, many of plaintiff's bonus offers, such as a discount price on the knife block and free steak knives, are not original to plaintiff. (*See* Defs.' Opp'n (# 38), at 7–9, Ex. 7 (compilation of prior infomercials for kitchen knives using similar bonus offerings).) Furthermore, since plaintiff did not offer

---

**5.** Further differences are present in the order of the demonstrations and presentation of the knives; in the space of the dialogue; the interactions between the co-hosts; and the settings. (*Compare* Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), Exs. A1–A3 (the parties' infomercials).)

verbatim comparisons of the text in the scripts, it is difficult to evaluate whether they are extrinsically or intrinsically similar.

### 3. Evaluation of Plaintiff's Trade Dress Infringement Claim (Count III)

Plaintiff also claims that defendants' actions constitute trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). (Compl.(# 2) ¶¶ 50–58.) Under § 1125(a),

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Trade dress is defined as "the 'total image of a product' and may include features such as size, shape, color, color combinations, texture or graphics." *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993) (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir.1989)). Plaintiff alleges the following elements make up their trade dress; the infomercial, the telephone operator script, and the "creative features of the handle design for the knives, the selection of the particular individual knives, and their composition into an arbitrary set." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), at 6–7.)

According to plaintiff, defendants have used plaintiff's trade dress in conjunction with selling their own set of knives. (Compl.(# 2) ¶ 55.) A seller's adoption of a trade dress confusingly similar to another's may be actionable under § 43(a). A three part test has evolved for evaluating whether a trade dress is protected under this statute: (1) whether the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) whether the trade dress is not functional; and (3) whether there is any likelihood of confusion between a party's trade dress and an alleged infringer's. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768–769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

#### a. Distinctiveness of Miracle Blade's Trade Dress

Plaintiff maintains that its trade dress is inherently distinctive, and in the alternative, has at least acquired distinctiveness through secondary meaning. (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), at 24–26.) Defendants contend that plaintiff has not made the requisite showing under either. (Defs.' Opp'n (# 38), at 15.) The court agrees with defendants.

Trademark concepts on distinctiveness are used to evaluate trade dresses. Specifically, trade dresses, as with marks, may be sorted into five categories of increased distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc.*, 505 U.S. at 768. Trade dresses that are suggestive, arbitrary or fanciful are deemed inherently distinctive because they are capable of identifying products or services as coming from a specific source.

Trade dresses that are merely descriptive may only be protected if they have acquired secondary meaning. *Id.* at 769.

Plaintiff's first contention that its trade dress is inherently distinctive fails when applying the test to it. Plaintiff contends its trade dress is "inherently distinctive because the overall impression created by this trade dress is arbitrary, distinctive, and serves primarily as a designator of origin." (Mot. for T.R.O. & Prelim. Inj. (# 's 13/14), at 25.) Plaintiff further maintains that the infomercial, the script, the design of the knife handles, and the knives' organization as a set "evoke consumer recognition and association of a single source for the offered products." (*Id.*)

As noted above, inherent distinctiveness is achieved when the trade dress is capable of identifying the products as coming from a specific source. In evaluating whether a trade dress is inherently distinctive, the trade dress must be viewed as a whole to determine whether its combined elements give rise to this. A determination that the separate elements are merely descriptive is not fatal to a finding of inherent distinctiveness. *See, e.g., Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F.Supp. 980, 988–989 (D.Ariz.1992) (explaining that "it is the particular combination of these elements that gives rise to distinctiveness"). The key inquiry is whether the combination of all the elements conveys an overall impression of distinctiveness.

In evaluating the elements of plaintiff's trade dress as a whole, the court concludes that it is not inherently distinctive. Rather, plaintiff's trade dress is a combination and refinement of commonly used elements of other prior direct-marketed knife sets. For instance, a quick study of the comparisons provided by defendants indicates that many of the demonstrations that plaintiff alleges defendants copied, plaintiff actually recycled from prior knife infomercials. (Defs.' Opp'n (# 38), Ex. 7 (footage of actors on prior infomercials using tomatoes, bread, hammers, etc.).) Defendants also provided evidence that similar combinations of the knives offered by plaintiff's have been offered in the past by others. (*Id.*) Moreover, plaintiff alleges its telephone script is unique but fails to demonstrate how it is unique from prior scripts. While isolated instances of similar prior practices will not defeat a claim of distinctiveness, plaintiff's trade dress is simply not a unique one. Specifically, plaintiff has failed to demonstrate how its trade dress is unique from other direct-marketers of knives and how it serves to identify the products to a specific source.

■ As noted above, if plaintiff is able to establish that its trade dress has acquired secondary meaning then it might also be deserving of protection under § 43(a). A trade dress is said to have secondary meaning if the purchasing public associates it with a specific producer or source rather than with merely the product. Factors to consider including the following: (1) whether actual purchasers associate plaintiff's trade dress with its products; (2) the degree and manner of plaintiff's use of the trade dress; and (3) whether plaintiff's use of the trade dress has been exclusive. *Vision Sports, Inc.*, 888 F.2d at 615. Proof that a party has copied another's trade dress "strongly supports an inference of secondary meaning." *Id.* Evidence of a manufacturer's sales, as well as advertising and promotional activities are also relevant. However, the critical inquiry is the effectiveness of these efforts to create secondary meaning. *International Jensen, Inc.*, 4 F.3d at 824.

■ In reviewing plaintiff's application and exhibits, the court concludes that plaintiff has not demonstrated secondary meaning either. First, plaintiff has not provided any evidence that purchasers actually associate plaintiff's trade dress with

its products. Plaintiff has also not provided any evidence of the extent and manner of use of its trade dress other than to provide information concerning its marketing efforts. While this is relevant information, plaintiff fails to demonstrate that these marketing efforts have caused purchasers to associate plaintiff's trade dress with plaintiff. Plaintiff's arguments that defendant copied its trade dress are similarly insufficient and unpersuasive. In reviewing the infomercials side by side, it does not appear that defendants directly copied plaintiff's infomercial; rather, it seems defendants' infomercial contains demonstrations similar to those performed in plaintiff's and other prior infomercials. (Defs.' Opp'n (# 38), Exs. 7 & 8.)

### b. Miracle Blade Trade Dress' Functionality

 The second requirement of § 43(a) is that the trade dress be non-functional.[6] A product feature is functional if it is essential to the use or purpose of the item or affects its cost or quality. *Lisa Frank, Inc.*, 799 F.Supp. at 987. Functional features include those aspects of a product that make it easier for consumers or are cheaper to manufacture. *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381–1382 (9th Cir.1987). In contrast, non-functional features are those that are arbitrarily affixed or included for aesthetic purposes. A trade dress is examined as a whole when determining functionality. Thus, features, when considered separately as functional, may still create a non functional trade dress when considered together. *Id.* at 1381–1382.

■ Although the trade dress of plaintiff's knives is largely functional, this factor tips slightly in plaintiff's favor. Plaintiff is not trying to prevent defendant from selling their knives, or from using infomercials to sell them. Plaintiff is simply trying to prevent defendants from marketing their knives in a manner that infringes plaintiff's trade dress. (Mot. for T.R.O. & Prelim. Inj. (# 13/14), at 22–24.) In that regard, the focus of plaintiff's efforts is aimed at the way that plaintiff has presented its infomercial, the selections it has made in grouping knives together in offers, the design of the knife handles and blades, and the wording of its script and the packaging. There are multiple alternatives available to parties in developing the marketing materials for a product like plaintiff's.

### c. Likelihood of Confusion

 The final element requires plaintiff to demonstrate that defendants' use of a trade dress that is the same as of similar to plaintiff's is likely to confuse consumers. *International Jensen, Inc.*, 4 F.3d at 825. "A likelihood of confusion exists when consumers 'are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques.'" *Id.* (quoting *Metro Publishing, Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993)). A court is to view the total product and package with the eye of an ordinary consumer. *First Brands Corp.*, 809 F.2d at 1383–1384. Normally, a court is to consider the *Sleekcraft* factors[7] for

---

**6.** Since the trade dress at issue is unregistered, plaintiff, as the party asserting the trade dress protection, carries the burden of demonstrating the trade dress is not functional. 15 U.S.C. § 1125(a).

**7.** Those factors include: (1) strength of plaintiff's trade dress; (2) similarity between the trade dresses; (3) evidence of actual confusion; (4) marketing channels used; (5) type of goods and the degree of care likely to be exercised by the purchaser; and (6) defendant's intent in selecting its trade dress. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 616 (9th Cir.1989).

determining whether confusion likely exists between two trade dresses. *See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–349 (9th Cir.1979). However, consideration of all the factors is not necessary at the preliminary injunction phase. *First Brands Corp.,* 809 F.2d at 1384 (noting that if there are sufficient differences in the labeling of products, the inquiry into likelihood of confusion can end there).

A brief evaluation of the *Sleekcraft* factors shows this prong does not tip in plaintiff's favor. In fact, it appears that only one, use of similar marketing channels, weighs in plaintiff's favor. Otherwise, the other factors demonstrate the unlikelihood of confusion between the two dresses. First, it seems that both parties recycled many demonstrations from prior knife infomercials. And as such, purchaser are unlikely to be confused about the source of the knives because when there are many similar brands, consumers learn to differentiate one from another. *See International Jensen, Inc.,* 4 F.3d at 825. As noted above, the strength of plaintiff's trade dress is relatively weak. Further, plaintiff has not presented any evidence of actual confusion by consumers. Plaintiff has also only conclusorily stated, without presenting any supporting evidence, that defendants intended to copy its trade dress. In terms of similarity between the trade dresses, the similarity ends with recognizing the parties both sell knives through infomercials and telemarketing scripts that contain demonstrations and bonus offers common to prior infomercials. (*Compare* Mot. for T.R.O. & Prelim. Inj. (#'s 13/14), Exs. A1 & A2 (the parties' infomercials).) Moreover, the knives are labeled differently, the knife blades and handles appear to be different, and the infomercials' overall presentations are different. With regard to the scripts, plaintiff only provided an outline of the offers made but not the actual script used by defendants. Accordingly, sufficient differ-

ences exist between the parties' marketing efforts and the labeling of the knives to demonstrate that their total effects are different and to eliminate the risk of consumer confusion.

For the reasons discussed above, plaintiff has not established either probable success on the merits or the existence of serious questions going to the merits. As such, plaintiff is not entitled to a preliminary injunction under either the traditional or alternative standard and the court's inquiry ends here.

**C. Defendants' Motion to Transfer under 28 U.S.C. § 1404**

 Defendants request that the court transfer this action to the Central District of California. The court may transfer a case to another district "[f]or the convenience of parties and witnesses, in the interest of justice," when the case "might have been brought" there originally. 28 U.S.C. § 1404(a). The district court must "balance the preference accorded plaintiff's choice of forum with the burden of litigating in an inconvenient forum." *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). A plaintiff's choice of forum is normally only given substantial deference if the plaintiff is a resident of the district in which the action is brought. Otherwise, this bears little significance on determining whether to grant a discretionary transfer. *See, e.g., Collins v. JC Penney Life Ins. Co.,* 2002 WL 505931, *3 (N.D.Cal.2002). The moving party bears the burden of showing the balance of conveniences favors the transfer. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 279 (9th Cir.1979).

 The relevant factors in assessing a motion to transfer under § 1404(a) are: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the

interests of justice. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 89 F.R.D. 497, 499 (C.D.Cal.1981). These factors break down to a number of relevant considerations: convenience of the witnesses, convenience of the parties, relative ease of access to proof, judicial economy, and availability of compulsory process. *See E. & J. Gallo Winery v. F. & P. S.p.A.*, 899 F.Supp. 465, 466 (E.D.Cal. 1994).

■■■ Preliminarily, the court notes—and the parties do not dispute—that this action could have been brought originally in the Central District of California because a substantial part of the events giving rise to the claim occurred in that district. *See* 28 U.S.C. § 1391(b)(2).

### a. Convenience of the Witnesses

According to defendants, "the witnesses and the defendants and their employees or those working with them to create the accused infomercial and products are *all* in Los Angeles." (Defs.' Mot. to Transfer (# 36), at 6.) At oral argument, defendants stated that their employees and officers would be their key witnesses and that it would be a burden for them to travel to Reno. The affidavits from defendants' employees, consultants and officers that are attached to their opposition to the preliminary injunction support this. (Defs.' Opp'n (# 38), Decls. of Hastie, Kirby, Cardinal, Hoffman, Galinson & Sylva.) While plaintiff also mentions the potential for testimony from witnesses all over the country and from abroad, these witnesses are not identified and their anticipated testimony has not been presented to the court in the form of required affidavits or declarations. As such, the court can neither evaluate the role of these unidentified witnesses nor

realize the potential impact of a change in venue on them. *See E. & J. Gallo*, 899 F.Supp. at 467. Thus, based on the evidence before the court, the convenience of the witnesses factor tips in favor of transferring the action.

### b. Access to Proof

With regard to this factor, defendants assert that "[n]early all relevant documents are believed to be located in Los Angeles. These are working drafts and scripts, videotapes, production materials, design models, correspondence and all other physical materials associated with the accused show and the accused products, as well as Miracle Blade's show and products." (Defs.' Mot. to Transfer (# 36), at 7.) Plaintiff does not challenge these contentions. Indeed, plaintiff alleges in its complaint that its principal place of business is in Los Angeles, along with defendants Ebrands and Katsu. (Compl.(# 2) ¶¶ 2–3.) Because many of the activities giving rise to the litigation most likely occurred in the Central District of California, and all of the evidence remains in that district, consideration of access to proof suggests that transfer of this case to the Central District of California is appropriate.

### c. Convenience of Parties

Defendants contend that "nearly all the parties . . . are located in Los Angeles." (Defs.' Mot. to Transfer (# 36), at 6.) The pleadings and motions filed in this action indicate that all parties reside in California with the exception of defendant CMedia, an Oregon entity.[8] (*See, e.g.*, Compl. (# 2) ¶¶ 2–8.) Plaintiff, in response, does not challenge this, but merely asserts that the

---

8. However, CMedia's principal, Michelle Cardinal resides in California. (*See* Defs.' Opp'n (# 38), Cardinal Decl. V · 6.) Additionally, while plaintiff asserts that Galinson is a Flori-

da resident, Galinson has stated in affidavits to this court that he resides in Los Angeles. (*See* Defs.' Opp'n (# 38), Galinson Decl. ¶ 6.)

"burden on defendants to litigate in Nevada is at best minimal, if not non-existent." (Pl.'s Opp'n (# 53), at 22.)

Plaintiff's characterization of the parties' burdens as minimal is inaccurate. This is not a case where a few of the parties reside in Nevada or where at least primary counsel resides in the state. Instead, none of the parties are located in Nevada. Moreover, the plaintiff's attorneys are in Atlanta, Georgia, while defendants' are in Santa Monica, California, and the parties had to retain local counsel to practice before this court. Accordingly, it seems that this factor supports transferring the action to the Central District of California.

### d. Interests of Justice

In its determination of whether to transfer a case pursuant to 28 U.S.C. § 1404(a), a district court may consider which forum will provide a "speedier trial." *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 89 F.R.D. 497, 501 (C.D.Cal.1981). Based on the location of the majority of documents, it appears that transfer of this case to the Central District of California is in the interests of justice because it would make trial of this case easier, more expeditious, and less expensive. Moreover, California has a stronger interest than Nevada in protecting the interests of persons and businesses that reside and conduct business in California.

Plaintiff alleges that the interests of justice favor keeping the action here because this court and a magistrate have gained familiarity with the case and the issues and have ruled on several motions. Plaintiff argues that to transfer the case would result in delays and cause plaintiff harm. (Pl.'s Opp'n (# 's 13/14), at 23.) However, it is difficult to see how the parties will suffer greater delays by the transfer since this court has resolved plaintiff's request for preliminary injunctive relief.

Familiarity with governing state law is also a factor to be considered. However, in this case, this factor is neutral because plaintiff has alleged both Nevada and California state law claims. (*See* Compl. (# 2).)

Lastly, defendants advise they filed a related lawsuit against plaintiff and others in the Central District of California on May 9, 2002. This lends no support to transferring the action.

In sum, having balanced the factors outlined above, the interests of justice, access to proof, and convenience to the parties and witnesses, all favor transferring this case to the Central District of California.

### III. *Conclusion*

Accordingly, **IT IS ORDERED** that plaintiff's motion to strike (# 's 45/46) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that defendants' objections to declarations and evidence (# 37) are **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that plaintiff's motion for preliminary injunction (# 's 13/14) is **DENIED.**

**IT IS FURTHER ORDERED** that defendants' motion to transfer under 28 U.S.C. § 1404(a)(# 36) is **GRANTED.** The clerk shall transfer this case to the United States District Court for the Central District of California.