**Jack MACKIE, Plaintiff–Appellant,**

v.

**Bonnie RIESER; Seattle Symphony Orchestra Public Benefit Corporation, a Washington nonprofit corporation, Defendants–Appellees.**

No. 00–35839.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 2002.

Filed July 25, 2002.

Thomas W. Hayton, Cutler & Nylander, P.S., Seattle, Washington, for the plaintiff-appellant.

Steven P. Fricke, Christensen O'Connor Johnson Kindness PLLC, Seattle, Washington, and Mark M. Hough, Riddell Williams P.S., Seattle, Washington, for the defendants-appellees.

Before: RYMER, McKEOWN, and GOULD, Circuit Judges.

McKEOWN, Circuit Judge:

This case of admitted copyright infringement leads us to clarify our longstanding rule regarding the quantum of causation necessary to obtain indirect profits damages. Jack Mackie, creator of the popular outdoor artwork in Seattle known as "The Dance Steps," sued the Seattle Symphony Orchestra Public Benefit Corporation (the "Symphony") for copyright infringement after the Symphony, without Mackie's permission, used his artwork in a Symphony promotional campaign. Unfortunately, Mackie did not have a registered copyright on the work at the time of infringement and consequently could not take advantage of statutory damages for infringement,[1] nor did he have evidence to sustain a claim for the Symphony's direct profits. 17 U.S.C. § 412(2). Instead, he was left to pursue claims for indirect profits and actual damages.

Mackie appeals an order granting summary judgment in favor of the Symphony on the issue of indirect profits. The district court reasoned that Mackie failed to demonstrate a tangible nexus between the infringing use and the Symphony's revenues and, alternatively, held that any such computation of damages was far too speculative to survive a summary judgment motion.

■ In consonance with our holding in *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir.1985), and subsequent rulings from several of our sister circuits, we hold that to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement. Because Mackie failed to adduce any non-speculative evidence that would even suggest a link between the infringement and the Symphony's supposedly enhanced revenues, we affirm the district court's entry of summary judgment.

Mackie also appeals from the district court's judgment in his favor of $1,000 in actual damages and costs entered jointly and severally against the Symphony and Bonnie Rieser, a graphic artist who provided artwork for the Symphony's campaign. Mackie argues that the district court erred by failing to account for his subjective objections to the manner in which his work was used. Mackie's argument finds no support in the law of copyright damages. Consequently, we affirm the actual damages award.

## BACKGROUND

Mackie is a Seattle-based artist who specializes in creating public works. In 1979,

---

1. Subject to the court's determination of a "just" award, statutory damages range from $750 to $30,000, and the court may award up to $150,000 in a case of willful infringement. 17 U.S.C. § 504(c).

he received a commission from the City of Seattle to develop a series of sidewalk installations in the Capitol Hill neighborhood entitled "The Dance Steps." As the title suggests, the installation consists of eight schematic diagrams that depict the basic steps of various popular dances; these schematics are based on the "how-to" instructions that were popularized by the late Arthur Murray and his chain of dance studios. The footsteps are cast in bronze and embedded in sidewalks.[2] One of the "Steps," entitled "The Tango," depicts steps and movements associated with the popular Argentinian dance. It is identified by an accompanying plaque that reads "Jack Mackie, Chuck Greening, artists, © 1979."[3]

In 1995, the Symphony contracted with Rieser, a Seattle-based graphic artist, to help design its direct-mail subscription campaign for various series in the 1996–97 season. One such series was called the "Pops," which included performances of well-known music from movies and Broadway shows.

For the "Pops" series, Rieser decided to create a montage that combined images of the Symphony's then-future Benaroya Hall and other aspects of Seattle culture. She created the backdrop by electronically scanning an architectural rendering of the future concert hall's rectangular acoustic tiles into her computer's hard drive. Having been enamored with "The Dance Steps" as an aspect of Seattle's public art, Rieser also decided to incorporate "The Tango" into her design. She photographed the work, scanned the photographs, and then superimposed the image

onto the tile backdrop. Rieser completed her work by "painting" pastel-like swirls, "writing" in several dance and musical terms of art, and incorporating representations of the Statue of Liberty and the Seattle skyline. Her collage also contained a portion of the plaque that accompanies "The Tango," but omitted the accompanying copyright notice.

The Symphony incorporated Rieser's artwork into a twenty-four page promotional brochure. The collage appeared on page twelve of the brochure, directly following a page that contained information about the Pops performances. The brochure was mailed to approximately 150,000 individuals located throughout the United States. Additionally, the Symphony made other collateral uses of the image, but Mackie did not seek damages for those infringements.

Following the Symphony's use of her collage, Rieser solicited publication of an article in "Step By Step Graphics Magazine" that detailed the process she employed to create her artwork. The magazine ran the article, which explained among other things her methodology for photographing "The Tango" and scanning it into her computer.

Shortly after the article's publication, Mackie learned about Rieser's unauthorized use of "The Tango." After unsuccessful efforts to obtain remuneration from both the Symphony and Rieser, Mackie brought a copyright infringement action against them. He sought actual damages—including a hypothetical royalty payment and compensation for the loss of

---

**2.** Mackie created the bronze steps in association with Chuck Greening, who, although he retains ownership rights to the copyright in "The Dance Steps," is not a party to this case.

**3.** Mackie did not register his copyright in the work until October 13, 1998—after the in-

fringement—and he is therefore precluded from seeking statutory damages and attorneys' fees. 17 U.S.C. § 412. We also note that Mackie did not assert any claims based on the Visual Artists Rights Act, 17 U.S.C. § 101 et seq.

future employment opportunities—and the recoupment of profits that the Symphony generated during the 1996–97 season by appropriating "The Tango." Mackie also demanded profits for future seasons, arguing that many patrons who subscribed to the Pops series because of the infringing collage later renewed their subscriptions.

Following discovery, the Symphony moved for partial summary judgment on Mackie's demand for indirect profits. The Symphony argued that Mackie failed to establish a direct link between the infringing use and the Pops series revenue. The Symphony noted that Mackie's damages expert had testified that it was impossible to determine how much of the Pops revenue could be traced to the infringing artwork.

Mackie responded by submitting a supplemental expert declaration. Despite his earlier testimony about the speculative nature of estimating indirect profits, the expert now claimed that he was "able to find the income[specifically] attributable to the Tango Piece." He noted, for example, that a Symphony document entitled "Mid Campaign Strategy etc." stated that the Symphony "hoped or expected to get a return rate of 1.5% for its season ticket brochures." The expert then, without further analysis, deduced that "[a] 1.5% return rate . . . results in a computation of income from the Tango Picture comparable to which I [had earlier] computed."

After noting that indirect profits awards pursuant to § 504(b) are relatively rare, the district court concluded that the expert's deposition testimony and accompanying report were too "speculative" as a matter of law to support an award. The court noted the damages analysis was nothing more than "an estimate (based upon multiple estimates) of how many sales [of] the 1996–97 Pops series resulted from the Symphony's season brochure."

After the Symphony and Rieser conceded that they infringed Mackie's work, the parties proceeded to a bench trial on actual damages. Mackie testified that he objected to how Rieser and the Symphony divorced "The Tango" from its original artistic context. Mackie further testified that, as a consequence, he would have demanded a royalty of approximately $85,000 in a putative pre-infringement negotiation. He also claimed that the infringement caused $100,000 in damages because of harm to his reputation and future commissions.

During cross-examination, however, Mackie conceded that his putative loss of future earnings was speculative at best. He also admitted that he had previously given permission for others to use "The Tango" without payment of a royalty.

Similarly, Mackie's expert witnesses failed to provide any tangible support for his damages demands. For example, a Seattle-based curator testified that while Mackie could potentially lose public works commissions as a result of a supposed injury to his reputation, any such damages would be speculative.

Following trial, the district court issued findings of fact and conclusions of law. With regard to Mackie's contention that the infringement diminished his work's marketability, the court found that Mackie "has presented no persuasive evidence that Defendants' use of ["The Tango"] has caused him to lose commissions or other opportunities to license the use of his work commercially. The Court also finds that the Rieser work has not caused any discernible damage to Mr. Mackie's professional reputation." Disregarding Mackie's subjective objections to the manner in which Rieser and the Symphony utilized "The Tango," the district court employed a hypothetical negotiation framework to de-

termine that Mackie would have received a $1,000 royalty from the Symphony. Accordingly, the court awarded him damages in that amount plus various litigation-related costs.

## DISCUSSION

### I. INDIRECT PROFITS DAMAGES UNDER SECTION 504(B)

Section 504(b) of the Copyright Act provides the sole means to obtain monetary remedies for an infringement plaintiff who, like Mackie, has failed to register his copyright before infringement:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and *any profits of the infringer that are attributable to the infringement* and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b) (emphasis added).

On its face, § 504(b) does not differentiate between "direct profits"—those that are generated by selling an infringing product—and "indirect profits"—revenue that has a more attenuated nexus to the infringement. Nor does it discuss whether tort principles, such as causation, should play a role in determining whether the infringer's profits were a result of the infringing act. Nevertheless, in our prior decisions, we have held that a copyright holder must establish the existence of a causal link before indirect profits damages can be recovered.

In the seminal case of *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir.1985) ("*Frank I*"), we held for the first time[4] in this circuit that the language of § 504(b)'s predecessor, 17 U.S.C. § 101(b), was expansive enough to afford parties an indirect profits remedy under certain conditions.[5] There, the plaintiff, a music publisher, alleged that MGM infringed its copyright to several songs from the musical "Kismet" by including them without prior authorization in a Las Vegas show. *Id.* at 510. After concluding that MGM had indeed infringed the songs' copyrights, we held that the publisher could recover indirect damages, such as profits from the hotel's casino, that had been boosted by the show's promotional value provided that the profits were "ascertainable." *Id.* at 517.

Although *Frank I* did not attempt to define specifically the requisites for recovery of indirect profits damages, it did set forth general specifications to guide the inquiry. Notably, we held that a district court could preclude "recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement." *Id.* (citing 3 M. Nimmer, *Nimmer on Copyright*, § 14.03[A], at 14–15 (1985)).

---

**4.** Contrary to Mackie's suggestions, *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826 (9th Cir.1985) (per curiam), does not guide our review. In that case, the defendant, a brewing company that manufactured a popular brand of malt liquor, failed to appeal from a portion of the district court's judgment that awarded the plaintiff indirect profit damages—malt liquor sales supposedly generated by the brewer's infringing use in television commercials of the theme from the movie "Shaft." We did not pass judgment on the question of whether any of the profits could, as a matter of copyright law, properly be attributed to the infringement. *Id.* at 828.

**5.** Under the Copyright Act of 1909, a plaintiff could recover "all the profits which the infringer shall have made from such infringement...." 17 U.S.C. § 101(b) (1970).

In the same vein, we stated that "[i]n a copyright action, a trial court is entitled to reject a proffered measure of damages if it is too speculative." *Id.* at 513.

■ Although our discussion in *Frank I* of the relationship between causation principles and indirect profits damages was somewhat opaque, our holding strongly implied that a district court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits. Such an approach dovetails with common sense-there must first be a demonstration that the infringing acts had an effect on profits before the parties can wrangle about apportionment. To do otherwise would be inconsistent with both rudimentary principles of tort law, to which copyright law is often analogized,[6] and our earlier holding in *Frank I.*

Our damages framework finds further support in decisions from our sister circuits that address the same issue. *See, e.g., Univ. of Colo. Found. v. Am. Cyanamid Co.,* 196 F.3d 1366, 1375 (Fed.Cir. 1999) (holding that the plaintiff has the "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur); *Bus. Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399, 404 (2d Cir.1989) (holding that a plaintiff can recover indirect profits in the form of "value received from an infringing product used to enhance commercial reputation" if it first demonstrates that "the amount of an award is based on a factual basis rather than undue speculation") (internal quotation marks omitted); *see also Estate of Vane v. The*

*Fair, Inc.,* 849 F.2d 186, 189–90 (5th Cir. 1988) (affirming district court's refusal to award indirect profits damages allegedly resulting from infringing use of photographic slides in advertising); *cf. Taylor v. Meirick,* 712 F.2d 1112, 1122 (7th Cir. 1983) (noting in direct profits context that "[i]f General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits."). One of the leading treatises on copyright law also favors an inquiry into the causal relationship between infringement and profits before apportionment can occur. *See* 4–M. Nimmer, *Nimmer on Copyright,* § 14.03[A], at 14–29 (2001) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner."). Finally, we note that the principle of causation based on non-speculative evidence is nothing novel in the damages arena. *See, e.g., Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters,* 459 U.S. 519, 542–43, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (citing speculative nature of damages as basis for affirming dismissal of antitrust action); *MindGames, Inc. v. W. Publ'g Co., Inc.,* 218 F.3d 652, 658–59 (7th Cir.2000) (affirming grant of summary judgment in breach of contract case because damages evidence was excessively speculative), *cert. denied,* 531 U.S. 1126, 121 S.Ct. 882, 148 L.Ed.2d 791 (2001).

■ In sum, we hold that to survive summary judgment on a demand for indirect profits pursuant to § 504(b), a copy-

---

6.  *See Data Gen. Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1170 (1st Cir. 1994) (noting in actual damages context that "it is useful to borrow familiar tort principles of causation and damages"); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1614 at 225 (2d ed. 1986) ("A suit for copyright infringement may be analogized to *other* tort actions; all infringers are jointly and severally liable.") (emphasis added).

right holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement.

## II. MACKIE'S DEMAND FOR INDIRECT PROFITS

■ Applying the indirect profits analysis to the record in this case, we conclude that Mackie has not proffered nonspeculative evidence that is sufficient to create a triable issue of fact. Remarkably, Mackie's own expert stated that he could not "understand" how it would be possible to establish a causal link between the Symphony's infringing use of "The Tango" and any Pops series revenues generated through the inclusion of the collage in the direct-mail literature.

We agree entirely with the expert's original conclusion. Intuitively, we can surmise virtually endless permutations to account for an individual's decision to subscribe to the Pops series, reasons that have nothing to do with the artwork in question. For example, was it because of the Symphony's reputation, or the conductor, or a specific musician, or the dates of the concerts, or the new symphony hall, or the program, or the featured composers, or community boosterism, or simply a love of music, or ... ? In the absence of concrete evidence, Mackie's theory is no less speculative than our effort in this paragraph to enumerate even a relatively short list of the myriad factors that could influence an individual's purchasing decisions.

Additionally, even if we were to assume that the expert's supplemental, but contradictory, declaration was sufficient for the purposes of Federal Rule of Civil Procedure 56 to manufacture a genuine issue of material fact, we nevertheless conclude that the basis of his abrupt about-face was far too speculative to oppose the Sympho-

ny's motion successfully. His supposition that the Symphony's goal of generating a 1.5% response rate to its direct-mail brochure was somehow directly correlated with revenue generated by individuals who subscribed because of Rieser's art is a virtual non-sequitur. Even if such an aspirational yield percentage could be applied to determine how many people subscribed because of the brochure, such a rudimentary analysis cannot determine how many of those individuals subscribed *because of Rieser's work.* The thread is even more attenuated because the artwork was but one page in a multi-page brochure that advertised a series of concerts that were unrelated to the artwork itself. Rank speculation of that sort will not allow a copyright holder to survive a summary judgment motion on his claim for indirect profits.

We agree with the district court's determination that Mackie did not articulate a non-speculative correlation between the Symphony's infringement and subsequent Pops revenues.

## III. THE DISTRICT COURT'S AWARD OF ACTUAL DAMAGES

■ Mackie also appeals the district court's award of $1,000 in actual damages. He argues principally that the district court erred in failing to factor his subjective objections into a determination of what the Symphony and Rieser would have paid for a license to use "The Tango." We review this issue de novo because it is best characterized as a legal challenge to the standard for assessing the quantum of actual damages. *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.,* 189 F.3d 1017, 1024 (9th Cir.1999). Mackie's argument fails, however, because it fundamentally misapprehends the nature of the damages inquiry.

We have previously defined the phrase "actual damages" as "the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." *Frank I,* 772 F.2d at 512. To determine the work's "market value" at the time of the infringement, we have endorsed a hypothetical approach: "what a willing buyer would have been reasonably required to pay to a willing seller for [the owner's] work." *Id.* (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174 (9th Cir.1977)).

■ This case presents a slightly different twist. The record is replete with testimony from Mackie and his experts that the infringement did not in any way influence the market value of "The Tango." Perhaps recognizing this reality, Mackie sought to introduce evidence of his personal objections to the manipulation of his artwork. Although it is not hard to be sympathetic to his concerns, the market value approach is an objective, not a subjective, analysis. Consequently, Mackie's subjective view, which really boils down to "hurt feelings" over the nature of the infringement, has no place in this calculus. *See* Paul Goldstein, *Copyright,* § 12.1.1, at 12:14 (2002) (noting that actual damages, and its accompanying "market value" test, is "essentially an objective rather than a subjective measure of damages"). The district court did not err in declining to factor in Mackie's subjective view.

**AFFIRMED.**