**Gregory O'CONNOR, d/b/a Vision Enterprises, Plaintiff,**

v.

**CINDY GERKE & ASSOCIATES, INC., Realtors, Defendant,**

No. 01–C–0604–C.

United States District Court, W.D. Wisconsin.

Oct. 11, 2002.

See also 2002 WL 32344435.

Roy H. Nelson, for Plaintiff.

Michael P. Crooks, Peterson, Johnson & Murray, S.C., Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for monetary relief, plaintiff Gregory O'Connor, d/b/a Vision Enterprises, is suing defendant Cindy Gerke & Associates, Inc., Realtors, for copyright infringement, breach of contract and conversion relating to video production services provided by plaintiff. Jurisdiction is present under 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

Presently before the court are (1) the parties' cross-motions for summary judgment as to the copyright infringement claim and (2) defendant's motion for summary judgment as to the breach of contract claim. (Neither party mentions plaintiff's conversion claim.)

I find that the opening montage and the animated logo portions of the real estate show are plaintiff's copyrightable expressions and that defendant's admitted use of these items in another show constitutes copyright infringement. However, I find that no other elements of the show enjoy such protection. Therefore, I will grant in part and deny in part plaintiff's and defendant's cross-motions for summary judgment as to liability on the copyright infringement claim. In addition, because plaintiff has failed to show a nexus between the infringement and defendant's gross revenue, he will not recover plaintiff's gross revenue. As to plaintiff's alternative theory of value-in-use damages, because he did not ask for these damages until he filed his reply brief, defendant has not had an opportunity to respond to his theory or calculations. Therefore, defendant may have until October 18, 2002, to file a brief in response to plaintiff's value-in-use measure of damages. As to plaintiff's contract claims, I will grant defendant's motion for summary judgment. Finally, because neither party moved for summary judgment as to the conversion claim, this claim will proceed to trial.

One glaring procedural deficiency needs to be addressed. Notwithstanding this court's earlier admonishment, the parties have failed once again to follow the court's procedures for proposing findings of fact in support of summary judgment. First, legal arguments do not belong in proposed findings of fact. Hence the name proposed findings of *fact*. Second, directly after *each* fact proposed (including those proposed in rebuttal) there should be a *specific* citation to the record in support of that fact. Instead of following the procedure, the parties provided the court with a laundry list of "factual" sentences (in some cases, spanning more than a page of single-spaced type) followed by a string citation to the record. In addition to violating

this court's procedures, the parties' approach results in rambling, unsupported facts littered with legal arguments.

From the proposed findings of fact and the record, I find the following material facts to be undisputed.

## UNDISPUTED FACTS

Plaintiff Gregory O'Connor, d/b/a Vision Enterprises, produces real estate television shows and resides in Davenport, Iowa. Defendant Cindy Gerke & Associates, Inc., is a Wisconsin corporation with its principal place of business in La Crosse, Wisconsin. Defendant lists and sells real estate. Plaintiff and defendant agreed that plaintiff would produce a television show for defendant entitled, "Cindy Gerke Showcase of Homes." (I will refer to programs in this series as the "Vision–Gerke" show.)

Zane Sandom, president of Video Preview Realty, Inc., produced a real estate television program known as the "Mel Foster Show," which aired in the Quad Cities. Sandom also produced real estate shows for Century 21. Sandom approached plaintiff with the idea of marketing real estate shows beyond the Quad Cities. On June 1, 1998, plaintiff and Sandom entered into a one-year contract in which Video Preview "assign[ed] the exclusive rights to [plaintiff] to market" real estate shows in several states, including Wisconsin. (It is unclear whether the contract renewed automatically for another one-year period.) Sandom gave plaintiff a template of his operations manual for producing real estate shows, a copy of a tape of one of the Mel Foster shows and a template of video production services agreements. Plaintiff used Sandom's operations manual template as the basis for his own operations manual that he used to produce defendant's real estate show. Plaintiff used a "combination of things," including Sandom's video production services agreement, to create the contract it entered into with defendant.

Plaintiff solicited defendant to produce a real estate television program and, in doing so, showed defendant a copy of the Mel Foster Show as an example.

On or about June 21, 1998, plaintiff entered into a 52–week video production services agreement with defendant. The parties agree that the contract expired automatically on June 21, 1999. Defendant told plaintiff two weeks before the contract expired that it would not be renewing the contract. Under the agreement, plaintiff was to produce a weekly real estate television program featuring defendant's properties. The contract states in part:

> The term of the Agreement shall commence on the date first above written [June 21, 1998] and shall expire on the date which is fifty-two (52) weeks following [June 21, 1998]. In no event may the Purchaser terminate this Agreement at any time prior to twenty-six (26) weeks following [June 21, 1998]. Prior to such date, Purchaser may terminate this Agreement by providing [plaintiff] with written notice of termination at least four (4) weeks in advance of the termination date.

According to the contract, defendant agreed to pay plaintiff $2,500 a week to produce and broadcast a weekly real estate television show.

Sandom provided plaintiff "access to" Metro Studios, Inc., a for-hire production facility that Sandom used to produce the Mel Foster and Century 21 real estate shows. (It is unclear why Sandom needed to provide access to Metro Studios, which presumably is an independent business.) Plaintiff used Metro Studios to produce the Vision–Gerke show. Metro Studios does not assert copyright ownership for any real estate show for which it provided production services. Metro Studios never intended to be a joint author on the Vi-

sion–Gerke show. At the conclusion of Video Preview-produced real estate shows, the copyright notice indicates that Video Preview owns the copyright. When defendant paid plaintiff $2,500 for producing the Vision–Gerke show, plaintiff paid Video Preview $1,300, which, in turn, paid Metro Studios $1,000 for production services. Plaintiff paid $800 a week to broadcast the Vision–Gerke show on television.

Plaintiff gave defendant a copy of his operations manual, which outlines the format of the show, explains the procedures for producing the show and provides a general description of the contents of each segment of the show. The manual describes the "Show/Host Introduction" as a "30 second regional opening with music and video of various homes and nature scenes. Seasonal openings will be produced for use at appropriate times of the year." The manual describes the "Showcase of Properties" as follows:

Approximately 7 minutes of properties for sale, including a male and female announcer and music background with 1 to 4 slides of each 30 second property. On-screen graphics will reflect each property number, address, status (Open House, New Listing, etc.) and price (optional). After each property is shown and described by the announcer, the Realtor tag will appear with the Listing Agent(s)' name, photo, telephone numbers (home optional), and Realty identification.

The manual states further that in the "Host Bumper–Sponsoring Offices" segment that follows the showcase, "the host will do a 30 second on camera and voiceover which will identify the sponsoring brokers and end with a tease for more properties to come." The manual instructed defendant about the procedures for forwarding slides of the homes along with their written descriptions to Metro Studios.

Plaintiff suggested using landmarks and sites unique to La Crosse, Wisconsin, for the opening. At plaintiff's request, defendant selected the landmarks and sites that were used, including the bridge, Indian, opening french doors and homes. (Plaintiff relies on the deposition of Al Schmidt, president of Metro Studios, as evidence for its proposed fact that plaintiff "scouted the area and provided Schmidt with a list of photos he wanted taken." Plt.'s Resp. to Dft.'s Proposed Findings of Fact, dkt. # 61, at 4. However, plaintiff concedes in his own deposition that defendant selected the landmarks used in the opening scenes of the show.) Following plaintiff's instructions, Schmidt went to La Crosse to photograph the landmarks. Defendant provided its employee to drive Schmidt to photograph the landmarks. Plaintiff made the final decision concerning which landmark photos would be used in the video and the manner in which they would be used.

Defendant and Metro Studio staff wrote the introductions, openings, "bumpers" (transitions between each segment), advertisements and closings. Plaintiff and Metro Studios edited the scripts to fit within the allotted time frame. Defendant did not see the final script until the production crew came to La Crosse to shoot the video. Plaintiff had final approval of the scripts. Pursuant to the operations manual, on a weekly basis defendant provided Metro Studios with photographs of the homes it was listing and accompanying scripts describing the homes.

Defendant provided its logo, pink and white corporate color scheme and "realtors with a vision" slogan for use in the show. Plaintiff animated the logo by spinning it, incorporated defendant's color scheme throughout the show and used the slogan in the scripts.

Cindy Gerke, defendant's president, decided that she would host the show. (The

parties dispute who selected the music from several pieces that had been provided by Metro Studios. Schmidt avers that it was either plaintiff or a Metro Studios employee; defendant says it selected the music.)

At the conclusion of each Vision–Gerke show, the copyright notice indicated that plaintiff owned the copyright and that "[t]his has been a presentation of: Vision Enterprises." Metro Studios sent defendant a copy of the program every week and Cindy Gerke watched from beginning to end; she saw the copyright notice.

In January 1999, defendant gave TCI Cable Television a copy of the Vision–Gerke show to re-broadcast on cable television. (It is unclear how many times the show was re-broadcast.) After several days, plaintiff became aware of the re-broadcast and informed defendant that plaintiff was infringing on his copyright. After receiving this notice, defendant stopped re-broadcasting the Vision–Gerke show.

On July 8, 1999, defendant entered into a contract with TCI Media to produce a real estate television show. (I will refer to programs in this series as the "TCI–Gerke" show.) In July 1999, defendant re-shot the introductions, bumpers, advertisements and closings. Defendant gave TCI a copy of a Vision–Gerke show, but not a copy of plaintiff's operations manual. Defendant used the opening (which depicted sites and landmarks unique to La Crosse) and the animated logo from the Vision–Gerke show in the TCI–Gerke show because Cindy Gerke liked those aspects of the show and believed her company owned the rights to them. The opening and animated logo were used in every TCI–Gerke program broadcast from August or September 1999 to January 2001. The new show had other elements similar to those in the Vision–Gerke show, including the text of the introduction, the pink and white

color beds, the "more benefits" piece and the disclaimer displayed at the end of the program. Defendant changed the format of the TCI–Gerke show to allow for the viewing of more homes during the show. (Plaintiff asserts that more homes could have been featured in the Vision–Gerke show except for the fact that defendant failed to submit enough listings.) At the conclusion of each TCI–Gerke show, the copyright notice indicated that defendant owned the copyright.

On September 19, 1999, plaintiff registered the "photography, recorded + printed text, and sounds" of the Vision–Gerke show with the U.S. Copyright Office and obtained a certificate of copyright registration. In a letter dated October 14, 1999, plaintiff told defendant that the TCI–Gerke show infringed on his copyright.

Defendant reported gross revenues on its 1999 and 2000 tax returns of $1,135,010 and $1,373,154, respectively.

## OPINION

### A. Copyright

To succeed on its copyright infringement claim, plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358; *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 507 (7th Cir.1994). A "side-by-side" or "ocular" comparison is used to determine whether two works are substantially similar. *Wildlife Express,* 18 F.3d at 506 n. 1. The determination of substantial similarity is made by using the ordinary observer test, that is " 'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated

the plaintiff's protectible expression by taking material of substance and value.'" *Id.* at 509 (quoting *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir.1982)). Put another way, "two works are substantially similar if 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" *Id.* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960)).

Plaintiff obtained a certificate of registration from the U.S. Register of Copyrights for certain aspects of the Vision–Gerke show within five years of the show's first broadcast in June 1998. The registration establishes a rebuttable presumption at to the copyright's validity. *See* 17 U.S.C. § 410(c); *see also Wildlife Express*, 18 F.3d at 507.

Plaintiff alleges that some elements of the TCI–Gerke show are direct copies and other elements are substantially similar to the Vision–Gerke show. Specifically, plaintiff alleges copyright violations when defendant (1) made direct copies of the opening montage and the animated logo; (2) re-used the pink and white color beds and the "more benefits" piece; and (3) re-shot some segments of the show using scripts written by plaintiff, including the text of the introduction and disclaimer at the end of the program. *See* Plt.'s Br. in Supp. of Summ. J., dkt. # 54, at 5–6. In addition, plaintiff alleges copyright infringement when defendant instructed TCI to re-broadcast an entire Vision–Gerke show on cable television sometime in January or February 1999. *Id.* Defendant admits that it made a direct copy of the opening montage (which depicts the unique landmarks of La Crosse) and the animated logo from the Vision–Gerke show for use in the TCI–Gerke show and that it re-shot some segments using similar scripts. Defendant admits also that she asked TCI to re-broadcast an entire Vision–Gerke show. However, defendant argues that plaintiff's registration is invalid and the Vision–Gerke show is not copyrightable because (1) it lacks originality or authorship; and (2) to the extent that aspects of the show are copyrightable, defendant is either the author or a joint author with plaintiff and Metro Studios.

### 1. Originalty

"Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author." *Feist*, 499 U.S. at 348, 111 S.Ct. 1282. "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* at 345, 111 S.Ct. 1282 (citing 1 *Nimmer on Copyright* §§ 2.01[A], [B]). "The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* at 345, 111 S.Ct. 1282 (quoting 1 *Nimmer on Copyright*, § 1.08[C][1]). "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.* at 349–50, 111 S.Ct. 1282.

Defendant argues that "the idea for the [Vision–Gerke show] originated with Sandom" and, thus, is not original. *See* Dft.'s Reply, dkt. # 69, at 5. In particular, defendant asserts that the Vision–Gerke show is substantially similar to the Mel Foster show because both (1) open with an executive discussing the virtues of the real estate company; (2) use color to emphasize the property and price; (3) use similar placement of the logo, property description

and open house information; and (4) use the same transitional formats, that is, a segment of homes is followed by advertising, followed by bumpers, followed by another segment of homes and so on. However, defendant confuses "ideas" (noncopyrightable) with "expressions of ideas" (copyrightable). Copyright protection extends only to the particular expression of the idea and never to the idea itself. *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form which it is described, explained, illustrated, or embodied in such work."); *see also Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 547–48, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.").

■ In this case, the aspects of the Vision–Gerke and Mel Foster shows that defendant asserts are common to both shows are merely underlying ideas, not expressions of those ideas. Thus, even if plaintiff used these ideas from the Mel Foster show, he is not precluded from asserting originality as to his expression of these ideas in the Vision–Gerke show. Moreover, plaintiff has not claimed copyright infringement as to the overall format of the show. On the contrary, plaintiff has alleged that specific elements within the show have been copied in violation of his copyright. Nevertheless, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. Therefore, I will examine each element of the show in which plaintiff alleges a copyright violation has been committed.

a. Opening montage

■ Defendant concedes, as it must, that it copied the opening montage from the Vision–Gerke show, which showcases landmarks and sites unique to La Crosse, Wisconsin. (To the extent that defendant has asserted that the Mel Foster show is substantially similar to the Vision–Gerke show, it is worth noting that the Mel Foster show does not contain a photo montage of sites unique to its location.) The opening montage is a creative expression of an idea, which is copyrightable. 17 U.S.C. § 102. It contains several juxtaposed images on the screen at a given time, each blurring to red on the edges with images fading in and out and shifting positions, all of which is accompanied by background music. It is undisputed that even though plaintiff made the final selection, defendant selected the landmarks and sites used in the opening montage. (As mentioned earlier, the fact that Al Schmidt, president of Metro Studios, alleges that plaintiff initially selected the landmarks is meaningless given the fact that plaintiff himself concedes that defendant selected them.) Therefore, the critical question is whether defendant's initial selection of the landmarks confers joint ownership status over this element of the show.

■ The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In a joint work the co-authors hold undivided interests in a work, despite any differences in each author's contribution. 17 U.S.C. § 201. Each author has the right to use or license the use of the work, subject to an accounting to the other co-authors for any profits. *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1068 (7th Cir.1994); *Weinstein v. University of Illinois,* 811 F.2d 1091, 1095

(7th Cir.1987); 1 *Nimmer on Copyright,* § 6.02. Thus, even a person whose contribution is relatively minor enjoys a significant benefit, if deemed to be a joint author. *Erickson,* 13 F.3d at 1068.

■ In order to establish that the opening sequence is a joint work, defendant must show that (1) the parties intended to be joint authors at the time the work was created and (2) that each of their contributions to the opening scene is independently copyrightable. *Erickson,* 13 F.3d at 1071. (Although defendant argues that Metro Studios is also a joint author, Metro Studios has disclaimed any rights in the show and has averred that it never intended to be a joint author.) In *Erickson,* the court explored the analytical problems in cases such as this, in which "the parties have collaborated in some sense but dispute whether there was a mutual intent to create a joint work." *Id.* at 1068. The court held that the statute requires "that each author intend that their respective contributions be merged into a unitary whole" and that mere collaboration will not suffice. *Id.* at 1068–69 (citing *Childress v. Taylor,* 945 F.2d 500, 505–06 (2d Cir.1991)). Defendant argues that its act of selecting the landmarks in and of itself implies that the parties intended to be joint authors. However, the fact that the show carried a copyright notice indicating that plaintiff owned the copyright as well as a notice stating, in large type, that "[t]his has been a presentation of: Vision Enterprises" undermines defendant's position. *See Erickson,* 13 F.3d at 1072 ("credit" or "billing" may evidence intent, or lack thereof, to create joint work). Additionally, there is no evidence that defendant ever protested plaintiff's notices of sole ownership. *See Childress,* 945 F.2d at 509 ("subsequent conduct is normally probative of a prior state of mind"). Moreover, the fact that plaintiff instructed defendant to propose unique landmarks and had final decision making authority over which landmarks would be used does not suggest that plaintiff intended defendant to be a joint author. *See Erickson,* 13 F.3d at 1072 (noting plaintiff had entire decision making authority over whether contributions were included and where they would be placed). Defendant has failed to establish that plaintiff intended joint authorship. Without such intent, defendant cannot be considered a joint author. As a result, it is unnecessary to determine whether selecting the landmarks would be independently copyrightable. Because defendant is not a joint author and admits to using the opening montage in the TCI–Gerke show, it has infringed on plaintiff's copyright in that respect.

b. Animated logo

■ At the end of the opening montage (and in a few other instances), defendant's corporate logo (which is round) spins from off-camera to on-camera and comes to stop in the middle of a red background. This is a creative expression of an idea, which is copyrightable. 17 U.S.C. § 102. Other than asserting ownership over the static version of its logo, defendant fails to allege that it played any role in animating it. In fact, it is undisputed that plaintiff animated the logo with the help of Metro Studio, which never intended to be a joint author. As a result, plaintiff is the sole author of this element. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection"). Defendant concedes that it used the animated logo in the TCI–Gerke show. Accordingly, defendant infringed on plaintiff's copyright on the animated logo.

c. Pink and white colors and "more benefits" piece

█ It is undisputed that the pink (which looks more red than pink in the videos provided to the court) and white colors that plaintiff used in the Vision–Gerke show are defendant's corporate colors. Plaintiff did nothing more than incorporate these colors into the program. Copyright protection extends only to those components of a work that are original to the author. *See* 17 U.S.C. § 102(a); *Feist*, 499 U.S. at 348, 111 S.Ct. 1282. Moreover, the copyright registration applied only to "photography, recorded + printed text, and sounds." Therefore, plaintiff does not enjoy a rebuttable presumption as to the validity of the registration of these colors. Accordingly, plaintiff has failed to establish that defendant copied colors that are original to him.

In addition, other than a cursory reference to the " 'more benefits' piece," plaintiff fails to inform the court how or in what way this aspect of the show infringes on his copyright. Simply put, "[a]rguments not developed in any meaningful way are waived." *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir.1999).

d. Scripts

█ Plaintiff asserts that he is the author of the text used in the introduction and the disclaimer. Defendant concedes that it used these scripts, but asserts that it is the author of these pieces. It is undisputed that defendant and Metro Studios wrote the initial scripts. However, plaintiff argues that he and Metro Studios edited the scripts to fit within the allotted time frame and, therefore, he is the author. Without more, I cannot agree. Because plaintiff registered a copyright as to the recorded text of the show within the requisite five-year time frame, he has es-tablished prima facie evidence of the copyright's validity as to the recorded text. *See* 17 U.S.C. § 410(c); *see also Wildlife Express*, 18 F.3d at 507. The effect of the registration is to place the burden of proof on the alleged infringer to disprove the validity of the copyright. *Harris Market Research v. Marshall Marketing*, 948 F.2d 1518, 1526 (10th Cir.1991); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985). However, the undisputed roles of defendant as writer and plaintiff as editor rebut the presumption that the copyright is valid as to plaintiff's authorship of the introduction and disclaimer. Because defendant has rebutted the presumption of validity, the presumption drops out of the equation. Therefore, the risk of non-persuasion rests with plaintiff. *See Mid America Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir.1995) ("this is simply a rebuttable presumption and ... 'the burden of proof in the sense of the risk of nonpersuasion ... remains throughout the trial upon the party on whom it was originally cast.' "). Because plaintiff has failed to submit any evidence indicating how or to what extent he edited the scripts, I conclude that he has failed to establish "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345, 111 S.Ct. 1282. Accordingly, I find that plaintiff has failed to establish that the text of the introduction and disclaimer are works that are original to him.

e. Re-broadcast

█ Plaintiff asserts that defendant infringed its copyright by re-broadcasting the entire Vision–Gerke show on cable television sometime in January or February 1999. Although it is undisputed that after several days plaintiff notified defendant and defendant ceased re-broadcast-

ing, defendant has infringed on plaintiff's copyright in this respect. *See Feist,* 499 U.S. at 361, 111 S.Ct. 1282.

### f. Scenes a faire

 Defendant appears to argue that each element of the show is not copyrightable because the entire show is not copyrightable under the doctrine of "scenes a faire." The term scenes a faire refers to "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Atari,* 672 F.2d at 616 (internal quotation omitted). Under this doctrine, elements of an original work are not protected if the " 'common idea is only capable of expression in more or less stereotyped form.' " *Id.* (quoting 3 *Nimmer on Copyright,* § 13.0316[A][1], at 13–28).

 Defendant points to *Miracle Blade, LLC v. Ebrands Commerce Group, LLC,* 207 F.Supp.2d 1136 (D.Nev.2002), in support of its position. In *Miracle Blade,* both parties sold kitchen knives using an infomercial format that included using fruit, bread, vegetables, frozen objects, a porkchop, flowers and abuse demonstrations. *Id.* at 1142. The court held that the doctrines of originality *and* scenes a faire precluded a finding of copyright infringement because "[i]n the genre of television commercials for direct telephone/mail sales, scenes a faire include 'references to more expensive competing products, shots of print advertisements of such products, free offers of complimentary goods, close ups of the offered item in use, and close ups of 'undesirable' competing goods during similar use.' " *Id.* at 1150. If plaintiff were attempting to assert a copyright on the format or sequence of the Vision–Gerke real estate show, I might agree with defendant that this is a common idea that is capable of expression only in a more or less stereotyped form and, therefore, the concept of scenes a faire precludes copyrightability. However, plaintiff is asserting copyright infringement only as to certain elements of the show. The scenes a faire doctrine would be applicable only if an individual element is a common idea capable of basically one type of expression. Without doubt, the opening montage and the animated logo each could have been created in dozens of different ways. Thus, the doctrine of scenes a faire is not applicable.

### 2. *Damages for copyright infringement*

Having found that defendant infringed plaintiff's copyright by copying the opening montage and animated logo directly, I turn to the parties' arguments concerning damages. Under the Copyright Act, a copyright owner may recover:

> the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). Plaintiff has never affirmatively elected statutory damages. *See* 17 U.S.C. § 504(c) ("the copyright owner may elect, at any time before final judgment is rendered, to recover" statutory damages); *see also id.* (if non-willful, damages "not less than $500 or more than $20,000 as the court considers just"; if willful, damages "not more than $100,000"). Therefore, at this juncture, plaintiff is limited to monetary recovery of actual damages and defendant's profits. *See* 4 *Nimmer on Copyright* § 14.04[A].

Defendant reported on its 1999 and 2000 tax returns gross revenues of $1,135,010 and $1,373,154, respectively. Plaintiff alleges that defendant's gross revenues for the period during which the infringing show aired (July 1999 to January 2001) plus three months after the show ceased airing (to April 2001) is $2,398,376.99. (Actually, plaintiff alleged $2,401,043.63 in total gross revenues for this period but his math contained a transposition error as to defendant's gross revenue for 2000.) Plaintiff calculated the $2,398,376.99 as follows: $567,504.99 (July 1999 to December 1999, 1999 gross revenue of $1,135,010 divided by 12 months and then multiplied by 6 months) plus $1,373,154.00 (2000 gross revenue) plus $457,718.00 (January 2001 to April 2001, 2000 gross revenue of $1,373,154.00 divided by 12 months and multiplied by 4 months). In other words, plaintiff argues that he is entitled to $2,398,376.99 in actual damages, which represents defendant's gross revenues.

The parties dispute whether plaintiff is required to prove a nexus between the infringement and defendant's gross revenue *before* the burden shifts to defendant under § 504(b). In this case, the infringing video segments were not sold by defendant but rather used as a sales tool to advertise homes it had for sale. Thus, plaintiff is seeking gross profits from the sale of the homes and not the sale of copyrighted material. In copyright law, such profits are referred to as "indirect profits." (Conversely, "direct profits" concern revenue generated from selling the infringing product itself.) Defendant cites two cases, *Andreas v. Volkswagen of America, Inc.*, 210 F.Supp.2d 1078 (N.D.Iowa 2002), and *Mackie v. Rieser*, 296 F.3d 909 (9th Cir.2002), in support of its position that plaintiff must show some link between the infringement and defendant's indirect profits before the burden shifts to defendant.

In *Andreas*, the defendant infringed the plaintiff's copyright by using his copyrighted text in a television commercial for an Audi TT automobile. *Id.* at 1079. The jury awarded the plaintiff $570,000 in profits. *Id.* at 1080. The district court held that in the case of indirect profits, it may deny recovery of profits if they are only remotely or speculatively attributable to the infringement. *Id.* at 1082 (citing *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir.1985)). The court concluded that as a matter of law "[t]he plaintiff failed to present evidence that the revenue received by Audi through the sale of the Audi TT was a result of the infringement of the plaintiff's copyright." *Id.* at 1083–84. In support of this position, the court cited, among other cases, *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir.1983). *Id.* at 1082. (I will discuss *Taylor* in detail shortly.)

In *Mackie*, the defendant artist included an image of the plaintiff's sculpture in an advertising brochure for co-defendant Seattle Symphony Orchestra. *Mackie*, 296 F.3d at 912. Thus, the infringement concerned indirect profits. *Id.* at 914. The court held that to defeat a motion for summary judgment, "a copyright infringement plaintiff seeking to recover indirect profit damages under 17 U.S.C. § 504(b) must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement." *Id.* at 911. The court held that "a district court could preclude 'recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement." *Id.* at 914 (quoting *Frank Music*, 772 F.2d at 517); *see also* 4 *Nimmer on Copyright*, § 14.03[A]; *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir.2001) (holding that "gross revenue should not be construed so broadly as to include revenue

from acts unrelated to infringement" and citing *Taylor*, 712 F.2d at 1112, in support); *University of Colorado Found. v. American Cyanamid Co.*, 196 F.3d 1366, 1375 (Fed.Cir.1999) (holding that plaintiff has "burden" to demonstrate a nexus between the infringement and the indirect profits before apportionment can occur); *Business Trends Analysts, Inc. v. Freedonia Group, Inc.*, 887 F.2d 399, 404 (2d Cir.1989) (plaintiff can recover indirect profits in form of "value received from an infringing product used to enhance commercial reputation" if it first demonstrates that "the amount of an award is based on a factual basis rather than undue speculation") (internal quotation marks omitted); *Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 189–90 (5th Cir.1988) (affirming district court's refusal to award indirect profits damages allegedly resulting from infringing use of photographic slides in advertising). Moreover, in support of its position that some nexus is required, the court cited *Taylor*, 712 F.2d at 1122, among other cases. *Mackie*, 296 F.3d at 915.

Plaintiff argues that the difference between the facts in this case and the facts in *Andreas* and *Mackie* is that in this case defendant neither hired an advertising agency (*Andreas*) nor an artist (*Mackie*) to create the infringing work; rather, defendant did the infringing itself. However, I am not persuaded by this distinction because neither case nor the myriad of other cases addressing the issue alludes to the impact of the infringer's role on the analysis.

Plaintiff argues next that the Court of Appeals for the Seventh Circuit does not require him to show some nexus between the infringement and defendant's gross revenue before the burden shifts to defendant. In support of his position, plaintiff cites *Deltak, Inc. v. Advanced Systems, Inc.*, 574 F.Supp. 400 (N.D.Ill.1983) (Pos-

ner, J., sitting by designation), *rev'd and remanded on other grounds, Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357 (7th Cir.1985). In *Deltak*, the infringer used an infringing pamphlet as a sales tool rather than actually selling the infringing item. *Deltak*, 574 F.Supp. at 403. Statutory damages were unavailable because the plaintiff had failed to register the copyright. *Id.* at 402; *see also* 17 U.S.C. § 412. The district court hypothesized that if a person stole a copyrighted tune and used it to advertise cat food and if that person could prove that the theft increased the defendant's cat food profits by $1 million dollars, these profits would be recoverable under § 504(b). *Deltak*, 574 F.Supp. at 403. The district court continued that *if the plaintiff proved the gross revenues that the infringer obtained from the infringement, then the burden would shift to the infringer* to prove what fraction of those revenues were costs that would have been avoided had the infringement not occurred. *Id.* (emphasis added). Clearly, in *Deltak*, the court required the plaintiff to establish some nexus before the burden would shift to the defendant. In fact, the court held, "[w]hen the infringement consists of the unauthorized use of the plaintiff's sales tool, the plaintiff must establish either the extra profits that he would have had if the infringer had not used the sales tool, or ... the extra profits that the infringer gained from using it." *Id.* at 403–04. On appeal, the court of appeals reversed and remanded on other grounds, allowing for another measure of actual damages known as "value of use" to the infringer (cost saved by infringing rather than purchasing). *Deltak*, 767 F.2d at 361. The court of appeals noted explicitly that because the plaintiff in *Deltak* did not appeal the lower court's determination that the copyright owner had to link the infringer's profits with the infringement before the burden shifted, it had no reason

to address this "questionable analysis." *Id.* at 360. Thus, even the court of appeals recognized that the lower court required some nexus before the burden shifted.

In any event, in *Taylor*, 712 F.2d at 1119, the Court of Appeals for the Seventh Circuit was more explicit about the requirement that the plaintiff establish some type of nexus between the infringement and the infringer's gross revenues before the burden shifts to the infringer. (As mentioned earlier, *Taylor* was cited approvingly for this proposition by the district court in *Andreas*, 210 F.Supp.2d at 1082, the Second Circuit in *On Davis*, 246 F.3d at 160, and the Ninth Circuit in *Mackie*, 296 F.3d at 915.) In *Taylor*, the defendant was a map maker who copied and sold three of plaintiff's copyrighted maps. *Id.* The defendant also sold 150 different maps as well as other merchandise during the same time period. *Id.* As evidence of the defendant's profits, the plaintiff estimated the percent of total net profits allocable to the sale of infringing maps and ignored the fact that the plaintiff sold other non-infringing maps as well as other merchandise. *Id.* The court held that "all that [the burden shifting language of § 504(b)] means is that [the plaintiff] could have made out a prima facie case for an award of infringer's profits by showing [the defendant's] gross revenues from the sale of the infringing maps. It is not enough to show [the defendant's] gross revenues from the sale of everything he sold, which is all, really, that [the plaintiff] did." *Id.* at 1122. In order to illustrate the nexus concept, the court stated, "If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits." *Id.*

▮▮▮▮ In this case, plaintiff merely put defendant's gross revenues from its tax returns into the record and rested his case. Notwithstanding an inference to the contrary I could draw from statements in *Deltak*, I am persuaded that under *Taylor* (which is the prevailing voice on the issue), plaintiff must show some minimal nexus between the infringement and defendant's gross profits before the burden shifts to defendant. Plaintiff has failed to meet that burden. First, plaintiff has not submitted any evidence that defendant's profits increased as a result of the infringing video. In fact, plaintiff has not even submitted any evidence that the gross revenue reported in defendant's corporate tax returns is derived from the sales of any of the homes that were showcased in the infringing shows. Moreover, the 1999 and 2000 tax returns indicate that defendant lost money; thus, defendant did not realize any profit. Even ignoring his burden to show a nexus, plaintiff fails to establish defendant's actual gross revenues during the two partial years of infringement (1999 and 2001). Instead, plaintiff resorts to averaging and estimating from the current or previous year. Certainly plaintiff could have gathered this information during discovery. It would be merely a matter of identifying the homes showcased in each infringing video and matching them with the gross revenue received by defendant if and when that home sold.

In any event, plaintiff argues alternatively in his reply brief that, at a minimum, he is entitled to the value-of-use measure of damages or lost profits. In *Deltak*, the court of appeals held that an alternative measure of recovery is defendant's value of use, which represents a fair market value of the infringed document. *Deltak*, 767 F.2d at 363; *see also Mackie*, 296 F.3d at 917 (quoting *Sid & Marty Krofft Television Productions v. McDonald's Corp.*, 562 F.2d 1157, 1173 (9th Cir.1977) ("value of use" is a "determination of what a willing buyer would have been reasonably re-

quired to pay to a willing seller for plaintiff's work")). Plaintiff contends that the fair market value of his work equals $200,000 ($2,500, the weekly contract fee, multiplied by 80 weeks, the period of infringement). However, one obvious problem with this figure is that it includes pass-through expenses that would have been incurred by plaintiff to broadcast the show ($800 a week) and to pay Video Preview for Metro Studios's production services ($1,300 a week). *See Taylor,* 712 F.2d at 1121 ("a loss of revenue is not the same thing as a loss of profits."). Defendant did not contract with plaintiff at a rate of $2,500 a week to create only the copyrightable portions of the show. On the contrary, plaintiff had an obligation to pay to broadcast the show on a weekly basis and obtain production services.

Another problem is that plaintiff asked for these damages in his reply brief only and, thus, defendant has not had an opportunity to respond to his theory or calculations. Although defendant carries the burden of persuasion in establishing that fair market value is anything less than the price it paid for the copyrighted work, *see Deltak,* 767 F.2d at 364, defendant has not been given an opportunity to refute plaintiff's position. Therefore, defendant may have until October 18, 2002, to file a brief in response to plaintiff's value-in-use measure of damages. There will be no reply brief.

### B. *Breach of Contract*

██ The parties dispute whether the contract required defendant to give four weeks' notice of cancellation before terminating the agreement. (Plaintiff's entire breach of contract argument consists of one sentence in his response brief, in which he argues that defendant failed to give four weeks' notice of its decision to terminate the agreement. *See* Plt.'s Resp. Br., dkt. # 60, at 2.) Defendant asserts, and plaintiff does not dispute, that Iowa

law governs plaintiff's breach of contract by virtue of the choice-of-law provision in their agreement. Therefore, it is unnecessary to do any choice-of-law analysis. The contract states in relevant part:

> The term of the Agreement shall commence on the date first above written [June 21, 1998] and shall expire on the date which is fifty-two (52) weeks following [June 21, 1998]. In no event may the Purchaser terminate this Agreement at any time prior to twenty-six (26) weeks following [June 21, 1998]. Prior to such date, Purchaser may terminate this Agreement by providing [plaintiff] with written notice of termination at least four (4) weeks in advance of the termination date.

It is undisputed that the parties' agreement expired on June 21, 1999, and that defendant gave "notice" two weeks before the contract expired. Plaintiff alleges (in his proposed findings of fact) that defendant owes plaintiff for shows that it would have produced two weeks *past* the expiration date of the contract. In other words, plaintiff contends that defendant owes it for weeks 53 and 54. (Thus, it appears that defendant paid for weeks 51 and 52 of the contract.) In response, defendant argues that it was required to give four weeks' notice only if it ended the contract before June 21, 1999. I agree. Although it is not entirely clear whether the phrase "[p]rior to such date" refers to the 26–week point or the 52–week point, this ambiguity is irrelevant. At the 48–week point the four-week notice requirement falls out of the equation because the contract self-terminates at 52 weeks. In other words, given the explicit termination date, the contract is unambiguous insofar as it does not require defendant to give *any* notice after 48 weeks. *See Howard v. Schildberg Construction Co.,* 528 N.W.2d 550, 555 (Iowa 1995) (if intent is clear and unambiguous from words of contract, court

enforces contract as written). The fact that defendant gave notice to plaintiff as a courtesy at the 50–week point does not mean that it is liable for weeks 53 and 54. Accepting plaintiff's theory would mean that the contract remained effective in perpetuity until defendant gave notice, rendering superfluous the explicit expiration at 52 weeks. *See id.* (contract not perpetual in absence of language that would place an ordinary person on notice) (internal citation omitted); *see also Dickson v. Hubbell Realty Co.,* 567 N.W.2d 427, 430 (Iowa 1997) ("Because we give effect to the language of the entire contract, it is assumed that no part of it is superfluous and an interpretation that gives a reasonable meaning to all terms is preferred to one that leaves a term superfluous or of no effect.").

■ In addition, plaintiff alleges (only in his proposed findings of fact) that defendant owes him for producing a show that the television station preempted. Defendant argues that the agreement requires plaintiff to determine whether the show's time slot would be preempted by the television station and, for that reason, defendant does not owe plaintiff for the cost of producing a show that was not aired. Plaintiff does not respond to defendant's argument in any fashion in his briefs. Accordingly, I will grant defendant's motion for summary judgment as to plaintiff's breach of contract claims.

## C. *Conversion*

Because neither party moved for summary judgment on plaintiff's conversion claim, this claim will proceed to trial. *See generally* 17 U.S.C. § 301(a) (Copyright Act preempts "equivalent right" under state law); *Dowling v. United States,* 473 U.S. 207, 217–18, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985) ("copyright does not easily equate with theft, conversion, or fraud"); *Natkin v. Winfrey,* 111 F.Supp.2d

1003, 1013 (Copyright Act does not preempt claims of conversion under Illinois law); *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 247 n. 2 (Iowa 1988) (because no copyright claim was pleaded, court assumed, without deciding, that federal copyright law does not preempt conversion claim and held that "conversion does not apply to the design and layout of printed material").

## ORDER

IT IS ORDERED that

1. The cross-motion for summary judgment by plaintiff Gregory O'Connor, d/b/a Vision Enterprises, as to liability on his copyright infringement claim is GRANTED as to the opening montage and animated logo and is DENIED in all other respects;

2. The cross-motion for summary judgment by defendant Cindy Gerke & Associates, Inc., as to liability on plaintiff's copyright infringement claim is DENIED as to the opening montage and animated logo and is GRANTED in all other respects;

3. Plaintiff's and defendant's cross-motion for summary judgment as to damages on plaintiff's copyright infringement claim is STAYED until October 18, 2002. Defendant may have until October 18, 2002, to file a brief in response as to plaintiff's value-in-use measure of damages calculation. There will be no reply brief;

5. Defendant's motion for summary judgment as to plaintiff's breach of contract claim is GRANTED; and

6. Plaintiff's conversion claim will proceed to trial, which is scheduled for November 4, 2002.